Dargan, Ch.,
delivered the opinion. — In the natural order of discussion, the first question on this appeal is, whether the Chancellor, who tried the cause on circuit, has adopted the proper construction of the will of James Sims, sen. I will not repeat the clause in question, which has been quoted at length in the circuit decree. It is, substantially, as follows: He directs that all the residue of his estate shall remain in the possession of his wife during her life, or widowhood, under the direction of his executors, with a discretionary power, on their part, to deliver any portion of it, as a loan, to any of his sons, with the exception of his son James, who was inhibited from receiving any part of the negro property. After the death of his wife, “all such estate,” (that is, the estate which he had previously directed to be left in the possession of his wife,) 11 with the increase ar'sing thereon” was to “ be collected together,” and appraised, and equally divided among his four sons, Matthew, John, Nathan and Reuben; they paying to James one-fifth of the appraised value of the estate.
The widow, Mrs. Elizabeth Sims, from the income of the estate thus left in her possession, purchased two negro girls. These negroes she, at first, acknowledged to belong to the estate of her husband; but, afterwards, disagreeing with her children, she asserted her own independent right to the negroes. She resolved to dispose of them and their issue, theii four in number, by her last will and testament. This she did ; and bequeathed them to Ephraim Lyles, whom she appointed as her executor, and, if he should die without lawful issue, then she gave the same negroes to Hopkins Sims.
The question, in the first place, is, whether these negroes belonged to the estate of James Sim, sr., or to the estate of Eli-beth Sims — and that involves the question, what estate, or interest, did Elizabeth Sims take in the estate of her husband, *116 which he directed to be left in her possession1? It will be remarked that the will gives her nothing in direct terms. ; Whatever she takes, must be given to her by implication. And there is another feature in the will equally clear. Whether she takes a life interest, or merely a maintenance and support, she takes no legal title to any portion of the estate, but merely an usufructuary right, or interest. But the question is, whether she was entitled to the whole income, or only enough thereof to afford her a comfortable maintenance and support. If she was entitled to the whole income, then the negroes, purchased with a portion of it, became her own property. And, if she was only entitled to a . support, the negroes purchased with the rents and profits of the testator’s estate, will, of course, in equity, be regarded as the ptoperty of the estate. Though the interpretation of this part of the will is, in my view, not free from embarrassments, I incline to think that the construction adopted by the Chancellor, is the best that can be given. The inquiry, in such cases, must always be, what did the testator mean? In this instance, the testator directed that “ the residue of his estate, of what nature soever, should remain in the possession of his wife,” with a power, on the part of his executors, (of the nature of a power of appointment.) to deliver any part, or all of the estate, to either of his four sons named, as a loan, under certain restrictions. At her death, he directs that “ all such estate,” that is, all “ his estate of what nature soever,” being the estate that he left in the possession of his wife, “ with the increase arising thereon,” should “ be collected together,” appraised and divided. Were the person in whose possession he had thus left his estate, other than his wife, it would be difficult to come to the conclusion, or to imply that anything whatever was intended to be given by these terms, to such person. I think that the implication rests solely on the relation which the testator bore to the person who was to have the possession, and the moral obligation to provide for the support of his wife. I could not do less than to imply this much in her favor. ’ But, as the implication rests solely upon the moral obligation, and it cannot be said that this extended farther than to provide for her a comfortable support and maintenance, it would seem that the implication should not be extended farther.
But what does the testator mean when he directs that all such estate as he had left in the possession of his wife, with the increase arising thereon, should, at her death, be collected together, be appraised and divided? And, especially, what does he mean by the phrase “ with the increase arising thereon?” It is urged that these words mean the natural increase of the slaves. It would be an awkward and unusual form of expression, to speak of the increase arising on *117 slaves. It is usual to say the natural increase, or issue of slaves. If the testator had said “the increase arising on the slaves,” the words would, of course, mean nothing else the issue of the slaves. But the testator has not so expressed himself. If he had so intended, it would have- been natural and easy for him to have done so, and in forms of expression more appropriate than that employed in this clause. The word increase does not, ex rei termini, import issue, or increase in the way of natural procreation. But it is a general term, and, when applied to estates or property, and unexplained by the context, means all species of augmentations and additions, whether from natural procreation, crops, rents, interest, or dividends. It does not appear in this instance, as explained by the context, to have been used in the restrictive sense, but we are warranted the rather, by the context, to suppose it to have been used in the general sense. If there had been bank stocks, and choses in action, flocks and herds, among the property, which the testator left in the possession of his wife, (and this, to some extent, may have been the fact,) would it be said that the accretions, or “ the increase arising thereon,” or so much thereof as was not consumed in support of the wife, ought not, under the provisions of the will, to have been brought into the division?
This is the result of my best and most deliberate judgment, though, as I have before stated, I do not think that the construction which has been given is free from difficulty.
When the judgment of the Court must be given upon a construction not entirely satisfactory, it is gratifying to know that the judgment may be supported upon other grounds, and upon arguments that are invincible. We will now suppose the negroes in controversy to have been the property of Mrs. Elizabeth Sims, at the time of her death. Conceding this, these complainants are not entitled to recover the negroes. Mrs. Elizabeth Sims died in March, 1820, and the defendants have been in the unbroken possession of the negroes, claiming them in their own right, and adversely to the plaintiffs, from the death of Mrs. Sims to the present time. Their adverse possession has continued for about twenty-five years before the commencement of this suit. This lapse of time will give rise to all the presumptions that may be necessary to consummate and quiet the title of the defendants to this property. On this subject, the Chancellor, following strictly the course of the decisions, makes these observations: “ After a possession of twenty-five years,” he says, “the Court will presume a sale, by the executor, for the payment of debts, an administration, de bonis non, after Lyles’s death, a sale by such administration, or almost anything else, in order to quiet the long possession.” This is strong language; but not stronger than is warranted by the authorities, or demanded *118 by a stern and imperative public policy. In regard to property not the product of manual labor, there is, perhaps, no title extant, in any part of the world, that could withstand the searching scrutiny of justice, and which, if traced to its origin, would not be found to be based upon fraud, rapine, spoliation or conquest.
This is especially true in relation to property in slaves. But we do not pause to inquire into the rights of the oiiginal captors to remove them from their native and desert homes, nor into the legality of all the intermediate transfers, since they were landed from the slave-ship upon our shores. The lands in America are not less the property of their present possessors, because the bold cavaliers of England and Spain seized them at the point, of the sword, or because William Penn and the Pilgrim Fathers acquired them from the simple aborigines, by more peaceful, but not much less unconscien-cious means. And, to go farther back, the title of the aboriginal tribes, who were in possession of the country at the time of its discovery, was acquired, (certainly, in some instances, and probably in all,) by the same means that were employed to oust and root them out. The same necessity that dictates the recognition of the de facto rights of nations and of governments, as to their territorial possessions, must prevail, more or less, among the members of social and political communities. Hence, among all people, where the rights of property are respected, some importance is attached to the mere fací of possession. Among rude tribes, simple occupancy is considered a sufficient title. In civilized communities, possession is regarded as only prima facie evidence of right. But, still, the necessities and repose of society make it the policy of the law to adhere to the principle of de facto right. For, when a possession, which, in its inception, was merely prima facie evidence of title, or which, in fact, may be pioved to have been wrongful, has continued for a sufficient length of time, it becomes right and perfect, as if acquired under all the formalities and solemnities of the law. The law requires diligence in the assertion of a right by legal actions. Life is short, parties and witnesses are mortal, memory is frail, written muniments are spread upon perishable materials and are subject to many accidents, and time throws a veil of obscurity over transactions of the distant past. Under circumstauces like these, is it either unreasonable or unjust, that he who has a claim should be required to assert it within a limited time? If he goes to sleep, and suffers his claim to lie dormant, can he complain if, when he wakes up, the Courts refuse to entertain his complaint?
To quiet titles founded upon possession, we have two systems of rules, that are different in their character, and the extent of their operation. Statutes of limitations are a part *119 of the lex fori. When the bar of the statute is set up by plea, Courts do not, in general, affect in the judgment to decide upon the right or title of the parties, but simply refuse their' remedial action. I say that this is the general rule. For by the provisions of our own statutes of limitations, and the judicial constructions which have been put upon them, a party who has held lands or chattels in possession for the statutory period, is considered to have acquired a good title, upon which he can himself maintain his action. The statutes of limitations in South Carolina do not extend to all cases. They do not bar actions upon specialties, or upon decrees and judgments, or suits in equity. There are provisos also, by which the rights of persons under certain disabilities are saved. Though the Court of Equity following the law have adopted the equity of the statute, and applied it to cases where the cause of action is of a legal character, and in fact, to all cases where a Court of law would be bound by it, (except where there is some peculiar countervailing equity,) yet these statutes do not afford sufficient relief against the prosecution of stale and antiquated demands; nor are they of any avail, in many instances, to prevent the disturbance of titles consecrated by a long continued possession. Hence we have another system of rules, founded upon what is called the doctrine of legal presumptions, which prevail alike in Courts of Law and Equity, and which are eminently subservient to the quieting of titles, and the prevention of litigation arising upon obscure and antiquated transactions. If these legal presumptions require a louger period than statutory bars to acquire force -and effect, they are more general in their operation. They are highly conducive to the peace of society, and the happiness of families; and relieve Courts from the necessity of adjudicating rights so obscured by time, and the accidents of life, that the attainment of truth and justice is next to impossible. Whenever things have fallen into this condition, it is a good and a wise rule, that would respect the possession, and leave it undisturbed as the legal test of right and title.
These legal presumptions, by which conflicting claims and titles are set at rest, I have endeavored to show are natural and necessary. They spring spontaneously out of the institution and relations of property. As to the precise time at which they arise, each independent community must judge for itself. We have adopted the law of the mother country. In South Carolina, as in England, by the lapse of 20 years without admissions, specialties and judgments are presumed to be satisfied, and trusts discharged. Twenty years continued possession will raise the presumption of a grant, from the State, of deeds, wills, administrations, sales, partitions, decrees, and the Chancellor has said of almost anything, that *120 may be necessary to the quieting a title which no one has disturbed during all that period. And it is the opinion of the / Court, that the rule has been well applied in this case.
There is another view in favor of the right of the complainants that may be superadded. The suits in trover brought for the recovery of these negroes, which have been enjoined, are brought in behalf and in the name of A. R. Aughtery, administrator of Hopkins Sims. He claims the negroes by virtue of a limitation in the will of Elizabeth Sims, by which he was to have the negroes, in the event of the death of Ephraim Lyles without. &c. My opinion is, that the limitation to Hopkins Sims is void for remoteness. I will not quote the words of the bequest, nor pause here to discuss this point. I will suppose that the limitation was valid. Ephraim Lyles was the executor of Mrs. Sims. He qualified, and brought “suits in trover against MatthewSims, Nathan Sims and Reuben Sims, to recover from each, such of the negroes embraced in the will of Elizabeth Sims, as had fallen into their possession respectively.” This was about the year 1821. He got a verdict against Matthew Sims, and an appeal was taken, which was dismissed. On the 7th February, 1824, a bill was filed by Matthew Sims and others, against Ephraim Lyles, executor of Elizabeth Sims. The bill was for an injunction of the suits at law, on the ground, that the negroes did, in equity, belong to the estate of James Sims, sr., having been purchased with the income of his estate. On the 14th of February, 1824, an interlocutory order for an injunction was granted. In October, 1824, Lyles died, and the suit abated. It is said that Hopkins Sims, the alleged remainder man, is not barred by the statute of limitations, because he was an infant at the death of Lyles, and has only attained the age of 21 years within four years before the commencement of his action. But Ephraim Lyles, as the executor of Elizabeth Sims, represented not only the estate given to himself in the negroes by the will, but also that given to Hopkins Sims. He never had them in possession, but was seeking, by actions instituted in his character of executor, t.o recover the negroes from persons then in possession, who were the present complainants. The statute of limitations commenced to run against Lyles when he first qualified as executor. It continued to run on, notwithstanding there was no grant of the administration with the will annexed. The doctrine is (except in the case provided for in the Act of 1824,) that where the statute has once commenced to run, it will continue to run, notwithstanding subsequent disabilities. The claim of Hopkins Sims to the ne-groes, if he ever had a title, is barred by the statute of limitations.
In regard to that branch of the case which relates to the *121 suits brought by John F. Sims, against Benjamin F. Sims as the executor of Nathan Sims, I have but little to say, besides expressing my concurrence with the views taken by the presiding Chancellor. The effect of a settlement in full is, prima facie, to bar all claims which might or should have been brought into the settlement. The case is strengthened, when, as in this instance, the party who afterwards prefers an omitted demand, is the party who is brought in debt, is required to give his note, is sued upon it, is pressed for payment, and pays it with great difficulty. And more; he slumbers over his omitted claim for years, and waits until the other party to the settlement is in his grave. He then wakes up, and says he has demands which were omitted in the settlement, for the omission of which he is able to give no satisfactory explanation.
If these had been admitted and introduced in the settlement, he would not have fallen in debt at all, for he had enough then to have balanced the account of Nathan Sims. If the sums were small, there would not be so much difficulty in believing that the O’Neall and Farr notes were omitted from forgetfulness or oversight. But the difficulty is enhanced, when the amount of the claim, (between $2,000 and $3,000) is considered. I am satisfied that the Circuit Court was right in holding John F. Sims concluded by the settlement.
The objection to the jurisdiction of the Court, made in the defendant’s fifth ground of appeal, cannot be sustained. In the case of E. Lyles v. Matthew Sims, decided by the Law Court of Appeals in 1833, it was held that the legal title in the negroes was in Elizabeth Sims, and after her death in her legal representatives ; and that this was the case, whether Elizabeth Sims took the whole income of the testator’s estate, under the will, or only a support and maintenance during her life. This latter question the law Court declined to decide, considering it as falling within the peculiar province of the Court of Equity. The complainants had a right to come into this Court to raise that question. As to the actions at law upon the O’Neall and Farr notes, the jurisdiction of the Court can be maintained on the ground that the complainants had a right to come into this Court, to seek a discovery from John F. Sims, (who was prosecuting said actions) in regard to the circumstances attending the settlement. And the Court, having entertained the bill for this purpose, had a right to retain it for judgment.
The other objection embraced in the defendant’s fifth ground of appeal, namely, that the bill was multifarious, is well founded. The actions at law upon the notes, and the actions of trover, had no such connection as to entitle the complainants to blend them in the same suit. They were entirely distinct transactions ; the one relating to the estate of James *122 Sims, si\, and the other to the estate of Nathan Sims. But the objection should have been taken at an earlier stage ol the proceedings, and by plea. The defendant cannot now, as a matter 0f right, make that question. If the defendant does not choose to make that defence, in the proper form, or waives it, the Court would not be precluded from noticing it, and founding its judgment upon it. But it is a matter of discretion ; and the Court does not think this a proper occasion to notice that objection on its own motion, and to dismiss the bill, and to send away the parties to commence another course of litigation.
The appeal is dismissed, and the decree is affirmed.
Dunkin, Ch. concurred.

Decree affirmed.